UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-against-<br><br>DERON BOONE,<br><br>Defendant. | **MEMORANDUM<br><u>OPINION & ORDER</u>**<br><br>23 Cr. 427 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Deron Boone is charged with felon-in-possession in violation of 18 U.S.C. § 922(g)(1). (Indictment (Dkt. No. 5)) He has moved to suppress evidence obtained by police officers during a February 14, 2023 search of his apartment in the Bronx. (Def. Br. (Dkt. No. 16) at 2)[1] For the reasons stated below, Boone's motion will be denied.

**<u>BACKGROUND</u>**

**I.       <u>ARREST AND INDICTMENT</u>**

Boone's arrest arises from a New York City Police Department ("NYPD") investigation of a February 14, 2023 shooting incident at 1428 Webster Avenue, Apartment 19G, Bronx, New York (the "Apartment"). (Dec. 12, 2023 Tr. ("Hrg. Tr.") (Dkt. No. 34) at 7) At that time, Boone lived in the Apartment with his roommate, Benjamin Fortune. (Id. at 123)

In the early morning hours of February 14, 2023, Fortune called 911 to report a shooting inside the Apartment. (Id. at 5; Fortune Affm. (Dkt. No. 16-4) ¶ 6) NYPD officers arrived a few minutes later to investigate. (Hrg. Tr. (Dkt. No. 34) at 7) The officers entered the apartment, and then obtained Fortune's written consent to search the apartment. (Id. at 21-22)

---

[1] The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

During the search, officers observed a small black safe in Boone's bedroom. (Cmplt. (Dkt. No. 1) ¶ 4(g)) The officers asked Boone to open the safe, but he refused to do so. (Id.) The officers then obtained a search warrant for the safe. (Id. ¶ 4(h)) After obtaining the search warrant, officers opened the safe and found a 9 mm. pistol inside. (Id. ¶¶ 4(j), 5) The firearm was analyzed for DNA, and the New York City Medical Examiner's Office determined that Boone's DNA is on the firearm. (Id. ¶ 6)

Magistrate Judge Figueredo issued a warrant for Boone's arrest on July 24, 2023 (Dkt. No. 2), and Boone was arrested on August 4, 2023. An August 17, 2023 indictment charges Boone with felon-in-possession in violation of 18 U.S.C § 922(g)(1). (Indictment (Dkt. No. 5) ¶ 1)

On October 2, 2023, Boone moved to suppress the firearm, arguing that the search of his bedroom at 1428 Webster Avenue – where the safe was found – violated his Fourth Amendment rights. (Def. Br. (Dkt. No. 16) at 2) Boone contends that Fortune was too intoxicated at the time to provide voluntary consent to a search of the Apartment. (Id. at 7-8) In the alternative, Boone argues that Fortune's consent was involuntary because a police officer told Fortune – before he provided written consent to search – that officers had already obtained a search warrant for the Apartment. (Id. at 8) Finally, Boone argues that Fortune – as Boone's adult roommate – lacked the authority to consent to a search of Boone's bedroom. (Id. at 10)

## II.   BOONE'S AND FORTUNE'S AFFIRMATIONS

In an affirmation submitted in support of his motion to suppress, Boone provides the following account of the shooting incident that brought the NYPD officers to his apartment:

> On February 13, 2023, I was sleeping in my room in the apartment when I awoke to the sound of banging. I opened my bedroom door and could see movement down the hall that leads to the front door of the apartment. The lights were off but I could see that someone was inside the apartment near the front door and the

kitchen. I heard numerous voices from the outside of the apartment yelling to open the door or they will blow the door off the hinges.

I heard popping sounds coming from the outside of the apartment that were muffled by the door. Then I heard gunfire from the inside of the apartment by the kitchen. I heard the front door swing open and I saw some light. I made my way up to the front door and closed the door and locked it. Whoever was in the apartment had left.

Mr. Fortune called 911 and the police arrived.

(Boone Affm. (Dkt. No. 16-3) ¶¶ 4-6)

In his affirmation, Boone describes his living arrangements with Fortune at 1428 Webster Avenue as follows:

I had been living there since October 2022. I lived there with Benjamin Fortune. I am not the leaseholder and I have never seen the lease but believe the apartment is in Mr. Fortune's name. The apartment has three bedrooms. I occupied one bedroom, Mr. Fortune had another bedroom, and the third bedroom was vacant. I paid for most of the household expenses and bought the cleaning supplies and most of the food. Mr. Fortune doesn't work or have much money, so I gave him money on occasion.

My bedroom is my private space. Mr. Fortune does not have my permission to enter my bedroom. He does not keep any personal belongings in my bedroom and has no reason to access it. At the time, my bedroom door could be locked from the inside.

(Id. ¶¶ 2-3)

According to Boone – prior to signing the written consent to search form – Fortune "had been drinking and smoking marijuana and was very intoxicated." (Id. ¶ 6)

Boone also states that – before Fortune signed the consent to search form – Boone heard a police officer say that the police had obtained a search warrant:

At some point, a detective asked me if they could search the apartment and I said no. The detective commented that he could get a search warrant and I told them to go ahead and do that. A short time later, I hear the apartment door open and a police officer yell, "we have the search warrant." The police then asked Mr. Fortune to go with them to the kitchen. I do not know what happened in the kitchen. Mr. Fortune returned to the living room with a sheet of paper. I asked him what it was and he said it was his copy of the search warrant. I took the

3

paper and saw that it was not a search warrant but an unsigned consent to search form.

(Id. ¶ 10)

After Fortune signed the consent to search form, officers began searching the Apartment.  Boone says that he remained seated in the living room while the officers conducted the search.  (Id. ¶ 11)  After officers found the safe in Boone's bedroom, they brought it to the living room.  Boone acknowledged that he owned the safe and that it came from his bedroom. (Id. ¶ 12)

According to Boone, he "never gave the police permission to search the apartment, [his] bedroom or the safe."  Indeed, he "specifically told [the officers] that [he] did not give consent."  (Id. ¶ 14)

Fortune also submitted an affirmation in support of Boone's suppression motion. (Fortune Affm. (Dkt. No. 16-4)).  In his affirmation, Fortune confirms that he "called 911" in connection with the shooting incident.  (Id. ¶ 6)  Fortune further states that he and Boone were "roommates" at the time, that "[Boone's] bedroom is his own private space," and that Fortune does "not have [Boone's] permission to go into his bedroom."  (Id. ¶¶ 3, 5)

Fortune also states that he was intoxicated during his interactions with police, and does not recall providing consent to search:

> [I don't have a] great memory of my interaction with the police because I had been drinking alcohol and smoking marijuana all day and was very intoxicated. In fact, I had blacked out in my bedroom before the shooting started.  I told the police that I was drinking and that I didn't remember a lot of what happened.  I do not recall giving the police permission to search the apartment.

(Id. ¶¶ 7-9)

III.    **EVIDENCE AT THE SUPPRESSION HEARING**

On December 12, 2023, this Court conducted an evidentiary hearing concerning Boone's suppression motion.  (Dkt. No. 34)  The Government called NYPD Officers Dwight Wanzer and Alonso Mora – who responded to Fortune's 911 call (Hrg. Tr. (Dkt. No. 34) at 2, 72) – while the defense called Defendant Boone.  (Id. at 123)  A number of exhibits were received during the hearing, including footage recorded on body cameras worn by NYPD officers.

A.    **Initial Questioning and Fortune's Consent to Search**

Officer Wanzer has been a police officer for seven years.  At the time of this incident, he was assigned to PSA 7, a housing police precinct in the South Bronx.  (Id. at 3-4)

At about 12:20 a.m. on February 14, 2023, Officer Wanzer and his partner, Officer Mora, received a report of shots fired at Apartment 19G, 1428 Webster Avenue, in the Butler Houses.  The officers arrived at the Apartment about five minutes later.  (Id. at 5, 7)  As Officer Wanzer approached the Apartment, he observed shell casings on the floor outside the Apartment.  (Id. at 10)

Officer Wanzer knocked on the front door of the Apartment, and Fortune answered the knock.  (Id. at 12)  Officer Wanzer explained that he and Officer Mora were there because of a report of shots fired at the Apartment.  (GX 2, at 0:04-0:10)  Fortune confirmed that a shooting incident had taken place at the Apartment's doorway.  (Id. at 0:08-0:20)  While the officers were speaking with Fortune, Boone came to the door.  (Hrg. Tr. (Dkt. No. 34) at 12; GX 2, at 0:08-0:20)

Body camera footage shows Fortune standing in the doorway, conversing with Officer Wanzer.  (GX 2)  Wanzer asks Fortune, "are you the one that they were shooting at?" and Fortune responds "yeah."  (Id. at 0:03-0:07)  Fortune reports that the shooting took place "at

the door," but states that he does not know the identity of the shooters.  (Id. at 0:13-0:18)

Fortune also tells Officer Wanzer that he had been drinking that night, making a drinking motion

with his hand (Hrg. Tr. (Dkt. No. 34) at 12; GX 2, at 0:10-0:13), and Officer Mora could smell

alcohol on Fortune's breath.  (Hrg. Tr. (Dkt. No. 34) at 96)  As shown on the body camera

footage, however, Fortune's speech is coherent, and he provides clear answers to Officer

Wanzer's questions.  (GX 2, at 0:04-0:20)[2]

Officer Wanzer asks Fortune for permission to enter the Apartment, and Fortune

agrees.  (GX 3, at 0:02-0:06)  As Officer Wanzer enters the apartment, he notices shell casings

on the floor.  He also notices bullet holes in the Apartment door; the holes indicate both that

shots had been fired into the Apartment and that someone inside the Apartment had fired shots

out through the Apartment door.  (Hrg. Tr. (Dkt. No. 34) at 13-14)  Wanzer asks Fortune and

Boone whether there is anyone else in the Apartment, and they answer no.  (Id.; GX 3, at 0:10-

0:13)

At 12:31 a.m., Officer Mora – while standing outside the Apartment – calls a

supervisor.  In the call, he describes Fortune as "intox" and "completely intox," and says that it is

hard to "get any info out of him" regarding the shooting incident.  (GX 51, at 0:09-0:11; GX 52,

at 0:20-0:28; DX D, at 0:16-0:22; Hrg. Tr. (Dkt. No. 34) at 77-78, 98)

---

[2]  Boone testified that Fortune was "drunk" when the officers arrived at the Apartment.  (Id. at
129)  According to Boone, Fortune was "not there" mentally when the police arrived; it was like
"[t]he lights [were] on, but nobody's home."  (Id. at 130)  Fortune was "always drunk" because
he "needs to drink."  (Id. at 129)

Officer Wanzer testified, however, that Fortune "seemed very coherent, [and] cooperative," and
that he "didn't have any slurred speech at all."  (Id. at 12-13)  Officer Mora likewise testified that
Fortune appeared to understand the officers' questions, and was "cooperative."  (Id. at 76, 78)
The body camera footage supports the officers' testimony that Fortune appeared to understand
the officers' questions and answered their questions.

After entering the Apartment, Officer Wanzer continues to question Fortune and Boone – who are seated in the living room – about the shooting.  (Hrg. Tr. (Dkt. No. 34) at 14)  Fortune and Boone both say that they had been in their bedrooms sleeping when the shots were fired, and that someone from "downstairs" was in the kitchen of the Apartment, firing shots out through the Apartment door.  (Id.)  Fortune and Boone also say that they do not know the name of the person who had fired shots from their kitchen.  They also could not describe any clothing that the shooter had been wearing.  (Id.; GX 2, at 0:07-0:11)

At about 12:33 a.m., Officer Wanzer began collecting pedigree information from Fortune and Boone, and he asked to see their identification.  Both men went to their respective bedrooms to retrieve identification.  (Hrg. Tr. (Dkt. No. 34) at 15-16; GX 4, at 0:08-0:22)  The door to Boone's bedroom was open, and his bed, clothing, and other personal effects were visible from the hallway.  (Hrg. Tr. (Dkt. No. 34) at 16, 40-41; GX 4, at 0:18-0:40)  Boone closed the door to his bedroom – but did not lock it – after retrieving his identification.  (Hrg. Tr. (Dkt. No. 34) at 42; GX 4, at 0:58-1:02)

The body camera footage shows Fortune retrieving his identification from a chest of drawers in his bedroom.  He continues to answer Officer Wanzer's questions while walking between the living room and his bedroom, and his answers continue to be clear and coherent.  (GX 4, at 0:24-0:58)

A third bedroom in the Apartment was unoccupied, and another officer asks Fortune for permission to search that bedroom.  (Hrg. Tr. (Dkt. No. 34) at 16, 38-39; GX 4, at 0:46-0:56)  Fortune agrees.  (Hrg. Tr. (Dkt. No. 34) at 17; GX 4, at 0:53-0:57)  The body camera footage shows Boone standing a few feet away, within earshot, as Fortune consents to the search of the third bedroom.  (Id. at 0:53-1:05)  Boone raises no objection.  (Id.)

After Fortune and Boone retrieved their identification, the officers – along with detectives – continue to question them in the living room about the shooting, including about the identity of the person shooting from their kitchen, as well as the person "who was shooting from the outside." (Hrg. Tr. (Dkt. No. 34) at 19-20; GX 5)  Fortune repeats that he had been drinking that night, and says that he cannot describe the person shooting from the kitchen because he had been drinking. (Id. at 45-46, 50)  Boone also tells Officer Wanzer that Fortune had been drinking. (Id. at 46)  Wanzer testified, however, that Fortune was "coherent" when responding to questions at this point. (Id.)

As to living arrangements in the Apartment, Fortune tells the officers that he and Boone are the Apartment's only occupants; that they sleep in separate bedrooms; and that Fortune is the Apartment's only leaseholder. (Id. at 19-20, 37-38; DX C, at 0:08-0:19)  Boone confirms that he is not the leaseholder. (Id. at 65-66, 133)

After about an hour of questioning,[3] the officers asked Fortune to join them in the kitchen so that they could read the consent to search form to him and obtain his written consent to a search of the Apartment.[4] (Id. at 19)  Officers Wanzer and Mora both testified that they asked Fortune – rather than Boone – for consent to search the Apartment because they understood that Fortune was the leaseholder. (Id. at 59, 65-66, 79)  Body camera footage shows

---

[3] The body cameras worn by Officers Wanzer and Mora were not activated for much of the time between their 12:25 a.m. arrival at the Apartment and the discovery of the safe in Boone's bedroom at 1:56 a.m.  Wanzer deactivated his body camera after about twenty minutes, while Mora deactivated his camera after about twenty-three minutes.  Both officers testified that they deactivated their body cameras when their initial investigation had concluded, and then reactivated their body cameras at about 1:43 a.m., just before the consent to search form was read to Fortune. (Id. at 55, 102-04, 110)

[4] Boone testified that – as the officers took Fortune to the kitchen to sign the consent to search form – he objected, telling the officers that Fortune was drunk. (Id. at 134)

Fortune walking into the kitchen with Officers Wanzer and Mora at 1:44 a.m., while Boone remains in the living room.  (GX 6; Hrg. Tr. (Dkt. No. 34) at 23)  Body camera footage also shows Officer Wanzer reading the consent to search form to Fortune, who appears to be reading a copy of the form while Wanzer is speaking.  (GX 53, at 0:10-1:19)

> The consent to search form states:

> I hereby authorize members of the New York City Police Department to remove from that location [specified above on the form] any documents, materials or other property they deem appropriate.  Such items, if any, will thereafter be safeguarded and invoiced according to New York City Police Department procedures.  I am a legal owner or lawful custodian of the location, vehicle, or items being searched, or otherwise have legal authority over them.  I have been advised of my right to refuse consent before any search is conducted.  I understand that I have the right to revoke such consent, in whole or in part, at any time.  I am giving my consent knowingly, voluntarily, and intelligently and without threats or promises of any kind.

(GX 100)

> Fortune nods and says "okay" or "mm-hmm" at several points as Officer Wanzer reads the form to him.  (GX 53, at 0:34-1:15)  When Officer Wanzer finishes reading the form, Fortune says that he is willing to sign it.  (Id. at 1:16-1:19)  Fortune tells Wanzer his full name – which he spells out – and then states his date of birth and address as Wanzer completes those sections of the form.  (Id. at 1:23-1:57)  Fortune then signs the form and begins to fill out the date and time.  (GX 54, 0:03-0:20)  Officer Wanzer directs Fortune to record the time of day in military time, telling him to write "0147" for 1:47 a.m.  (Id. at 0:22-0:28; Hrg. Tr. (Dkt. No. 34) at 22)  In the body camera footage, Fortune appears confused by Officer Wanzer's reference to military time.  (GX 54, at 0:23-0:48; Hrg. Tr. (Dkt. No. 34) at 51)  Wanzer tells Fortune to simply write "0147."  (GX 54, at 0:23-0:27, 0:30-0:40; GX 100)  Fortune fills out the month, day, and year on the form without difficulty.  (GX 54, at 0:46-1:12)

Officer Wanzer testified that when he read the consent to search form to Fortune, Fortune "seemed cooperative" and appeared to know "what was going on." (Hrg. Tr. (Dkt. No. 34) at 23)  Officer Mora – who was also present in the kitchen when Fortune signed the form – testified that Fortune was "coherent" and that he "understood what was presented to him." (Id. at 80)  In the body camera footage, Fortune provides clear answers to the officers' questions. (GX 53, at 1:16-1:57)  Apart from Fortune's confusion regarding military time, his speech and gestures in the video footage indicate that he understood what Wanzer was saying to him, and was responding appropriately. (See GX 53; GX 54)[5]

Both officers testified that they never drew their weapons, never handcuffed anyone, and never raised their voices while in the Apartment. (Hrg. Tr. (Dkt. No. 34) at 11, 20, 84)  They likewise did not observe any other officer engage in such conduct. (Id. at 11, 20, 83)[6]

### B.    The Discovery of the Safe in Boone's Bedroom

Fortune signed the consent to search form at about 1:47 a.m. (GX 54, at 0:18-0:20)  After obtaining a soft drink from the refrigerator, at about 1:50 a.m. Fortune returned to the living room – where Boone was sitting – with a copy of the consent to search form that he

---

[5]  Boone testified that – at some point before the officers obtained Fortune's written consent to search – a "Detective Bray" asked him for consent to search the Apartment. (Hrg. Tr. (Dkt. No. 34) at 130)  Boone told Detective Bray that he did not consent to a search and that the detective should get a warrant. (Id. at 131)

[6]  Boone testified that at some point before Fortune signed the consent to search form, he heard one of the officers say, "we got the warrant." (Id. at 134)  Officer Wanzer and Officer Mora testified that they did not hear any police officer say that they had obtained a warrant prior to Fortune signing the consent to search form. (Id. at 20, 82-83)  Given Officer Wanzer's efforts to secure Fortune's written consent to search and Fortune's willingness to cooperate – all of which is recorded on the body camera footage – it is not plausible that some other officer said "we got the warrant" as part of an effort to persuade Fortune to sign the consent to search form.

had signed.[7]  (DX F, at 6:24-7:00; Hrg. Tr. (Dkt. No. 34) at 61)  Boone and Fortune remained in the living room while the officers searched the Apartment.  (Hrg. Tr. (Dkt. No. 34) at 23)  At 1:56 a.m. – less than 10 minutes into the search – an officer returned to the living room with a small black safe found in Boone's bedroom.  (DX F, at 13:15-13:20)

After the safe was brought to the living room, officers asked Boone what it contained.  (Id.)  Boone said that the safe belonged to him, but that it contained his "personal" things and that he would not open it.  (GX 7, at 0:05-0:12; Hrg. Tr. (Dkt. No. 34) at 28)  At about 2:04 a.m., Boone again told the officers that he would not open the safe.  The officers told Boone that they would obtain a search warrant for the safe.  (GX 9, at 0:05-0:30; Hrg. Tr. (Dkt. No. 34) at 30)

At 3:11 p.m., a Bronx County Criminal Court judge signed a search warrant authorizing the officers to open the safe.  (GX 101; Hrg. Tr. (Dkt. No. 34) at 31)  After obtaining the search warrant, Officers Wanzer and Mora returned to the Apartment to open the safe.  (Hrg. Tr. (Dkt. No. 34) at 33, 87)  Before opening the safe, the officers again questioned Boone about its contents.  (GX 57)  In contrast to what he had told the officers that morning – i.e., that he owned the safe and that it contained his "personal" belongings (GX 7, at 0:05-0:12; Hrg. Tr. (Dkt. No. 34) at 28) – Boone stated that the safe did not belong to him, that he did not know what was inside the safe, and that he was holding the safe for someone else.  (GX 57, at 0:03-0:10; Hrg. Tr. (Dkt. No. 34) at 88)

---

[7] Boone testified that when Fortune returned to the living room, he repeated his objection that Fortune was drunk.  (Id. at 135)  Officers Wanzer and Mora testified that Boone did not object to the search of the Apartment until the safe was discovered in his bedroom.  (Id. at 23, 61, 68-70, 115)  As discussed below, the Court finds the officers' testimony more credible than Boone's testimony on this point.

The officers opened the safe at 4:49 p.m. and found a black 9 mm. pistol inside. (GX 300, at 2:42-2:58).  The officers placed Boone and Fortune under arrest.  (Hrg. Tr. (Dkt. No. 34) at 33, 89)[8]

## DISCUSSION

Boone contends that the firearm recovered from the safe should be suppressed because the search of his bedroom violated his Fourth Amendment rights.  (Def. Br. (Dkt. No. 16) at 2)  Boone argues that Fortune's consent to search was not "free and voluntary" because (1) he was intoxicated at the time that he provided consent; and (2) an officer announced that the police had obtained a search warrant before seeking Fortune's consent to search.  (Id. at 6-8) Boone further contends that he objected to the search at the time, and that Fortune had no actual or apparent authority to consent to a search of Boone's bedroom.  (Def. Post-Hrg. Br. (Dkt. No. 36) at 2, 6)

## I.   VOLUNTARINESS OF FORTUNE'S CONSENT

### A.   Applicable Law

One of the "specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); see also United States v. Hernandez, 85 F.3d 1023, 1028 (2d Cir. 1996) ("It is well settled that a warrantless search does not violate the Fourth

---

[8]  On February 17, 2023, Boone testified before a New York State grand jury in connection with his February 14. 2023 arrest.  (Id. at 165)  Boone told the grand jury that the police officers opened the safe before they obtained the search warrant; that the safe contained $5,000 in cash; and that the police officers stole the money after they opened the safe.  (Id. at 168)  In the instant case, Boone has not repeated his claim that officers stole money from the safe.  Boone has maintained, however, that he "heard" the police open the safe and look inside "at least three times" before they obtained a search warrant.  (Id. at 142, 144)

Amendment if 'the authorities have obtained the voluntary consent of a person authorized to grant such consent.'" (quoting United States v. Elliott, 50 F.3d 180, 185 (2d Cir. 1995))).

The Government has "the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." United States v. Isiofia, 370 F.3d 226, 230 (2d Cir. 2004) (citing United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983)).  Consent is voluntary where it is "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995) (citations and quotation marks omitted).  "Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" Isiofia, 370 F.3d at 231 (quoting Schneckloth, 412 U.S. at 227).  "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." Id. (citations and quotation marks omitted).

In determining voluntariness, courts consider, inter alia,

> (1) the [consenting individual's] age, education, [and] intelligence; (2) the length of detention; (3) the use of physical punishments or deprivations; (4) whether the alleged consenting person was advised of his constitutional rights; (5) whether the defendant was in custody and in handcuffs; (6) whether there was a show of force; (7) whether the agents told the defendant that a search warrant would be obtained; (8) whether the defendant previously had refused to consent; (9) whether the officers threatened or mistreated the defendant's family; and (10) whether the officers lied or otherwise psychologically coerced the defendant to obtain his consent.

United States v. Brown, No. 22 CR. 266 (PGG), 2023 WL 208171, at *10 (S.D.N.Y. Jan. 13, 2023) (internal quotation marks and citations omitted).

"[I]ntoxication may be a factor which impacts the voluntariness of an individual's consent to search." United States v. Nastri, No. 2:13-CR-14(3), 2014 WL 12675232, at *3 (D. Vt. Apr. 8, 2014).  The fact that a person is "under the influence of drugs or alcohol does not necessarily render consent involuntary, although intoxication may be considered in the evaluation of voluntariness." United States v. Isiofia, No. 02 CR. 520 (HB), 2003 WL

21018853, at *7 (S.D.N.Y. May 5, 2003), aff'd, 370 F.3d 226 (2d Cir. 2004); see United States

v. Perry, 703 F.3d 906, 909 (6th Cir. 2013) (consent was voluntary even though the defendant

was "drunk at the time"); United States v. Howard, 106 F.3d 70, 73, 80 (5th Cir. 1997) (consent

found voluntary; "although [defendant] appeared to be under the influence of some substance,

[he] was lucid, alert, and seemed capable of understanding what was happening").

      Finally, consent to search may be vitiated where a law enforcement officer falsely

claims that a search warrant has been obtained.  When

> a law enforcement officer claims authority to search a home under a warrant, he
> announces in effect that the occupant has no right to resist the search.  The
> situation is instinct with coercion – albeit colorably lawful coercion.  Where there
> is coercion there cannot be consent.

Bumper v. North Carolina, 391 U.S. 543, 550 (1968).  In sum, "there can be no consent" where

"that 'consent' has been given only after the official conducting the search has asserted that he

possesses a warrant."  Id. at 548.

**B.**    **Analysis**

      It is undisputed here that the officers never drew their weapons, never handcuffed

anyone, and never raised their voices in speaking with Fortune prior to obtaining his consent to

search.  (Hrg. Tr. (Dkt. No. 34) at 11, 20, 83)  Boone argues that Fortune's consent was

involuntary, however, because he was "admittedly and observably intoxicated" that evening.

(Def. Br. (Dkt. No. 16) at 7)

      In his affirmation, Fortune states that he had been "drinking alcohol and smoking

marijuana all day and was very intoxicated," and that he "[doesn't] have a great memory of [his]

interaction with the police."  (Fortune Affm. (Dkt. No. 16-4) ¶ 7).  The evidence at the

suppression hearing confirms that Fortune had been drinking.  When the officers first arrived,

Fortune told Officer Wanzer that he had been drinking.  (GX 2, at 0:08-0:12).  Boone also told

Officer Wanzer that Fortune had been drinking.  (Hrg. Tr. (Dkt. No. 34) at 46)  And a few minutes after the officers arrived at the Apartment, Officer Mora told a supervisor that Fortune was "intox[icated]" and that it was difficult to obtain information from him about the shooting. (GX 51, at 0:08-0:14; GX 52, at 0:23-0:28; DX D, at 0:15-0:22; Hrg. Tr. (Dkt. No. 34) at 77, 98) Officer Mora also testified that he could smell alcohol on Fortune's breath.  (Hrg. Tr. (Dkt. No. 34) at 96)

But while Boone testified at the suppression hearing that when the police arrived, Fortune was "not there" mentally – "the lights [were] on, but nobody's home" (id. at 129-30) – the body camera footage does not support Boone's account.  The body camera footage shows that Fortune was coherent and lucid in speaking with the officers.  He provides clear answers to the officers' questions about the shooting incident and his living arrangement with Boone.  (GX 2, at 0:05-0:18; GX 4, at 0:01-0:10, 0:45-0:57; GX 53, at 1:23-1:57; DX C, at 0:02-0:18; DX F, at 1:05-1:12)  Fortune's speech is not slurred, and he walks normally when moving from room to room in the Apartment, without stumbling or weaving.  (GX 4, at 0:08-0:20, 0:50-1:03; GX 5, at 0:04-0:20; GX 6 at 0:01-0:10; DX F, at 0:50-0:58, 6:35-7:09)  The camera footage shows Fortune, at various points, rummaging through a drawer, adjusting a curtain, and taking a soft drink out of the refrigerator; there is no lack of physical coordination.  (GX 4, at 0:24-0:28; GX 5, at 0:05-0:15; DX F, at 6:30-6:58)

Similarly, when Officer Wanzer reads the consent to search form to Fortune in the kitchen, Fortune appears to understand what Wanzer is saying, and to read along from his own copy of the form.  (GX 53, at 0:10-1:19)  Fortune's actions and remarks are appropriate in context.  Apart from not understanding Officer Wanzer's direction to use military time – a concept with which many are unfamiliar – Fortune has no difficulty in filling out the consent

form.  (GX 54, at 0:20-1:38)  In sum, the video evidence corroborates Officer Wanzer and

Officer Mora's testimony that Fortune appeared to be coherent, cooperative, and capable of

understanding what was happening.  (Hrg. Tr. (Dkt. No. 34) at 12-13, 18, 46, 76, 78-79)

      Acknowledging the evidence that Fortune had been drinking prior to the officers'

arrival at the Apartment, the record does not demonstrate that he was too intoxicated to provide

voluntary consent to a search of the Apartment.

      Boone also contends, however, that he heard an unidentified NYPD officer say –

at some point before Fortune signed the consent to search form – "we got the warrant."  (Id. at

134)  This Court does not credit Boone's account for several reasons.  As an initial matter,

Officers Wanzer and Mora were the officers primarily responsible for dealing with Fortune and

obtaining his consent to search, and neither officer heard any officer claim to have a warrant.

(Id. at 20, 82-83)  There is likewise no evidence that Fortune heard any officer make such a

claim.

      Moreover, Officers Wanzer and Mora were fully credible witnesses, while

Boone's varied accounts of what happened that evening have been marked by inconsistency,

contradiction, and implausibility.[9]  For example, when the officers first found the safe at 1:56

a.m., Boone acknowledged that the safe belonged to him (Boone Affm. (Dkt. No. 16-3) ¶ 12),

and said that it contained only his "personal" belongings.  (GX 7, at 0:04-0:10)  When the

officers returned later that afternoon with a search warrant for the safe, however, Boone claimed

---

[9]  The implausibilities in Boone's accounts begin with his story about the shooting inside the
Apartment.  According to Boone (and Fortune), someone from "downstairs" who they could not
identify and whose clothing they could not describe somehow gained entry to their apartment,
exchanged numerous shots with an unknown shooter outside the Apartment for unknown
reasons, and then fled the Apartment, all without explanation to Boone and Fortune.  (Hrg. Tr.
(Dkt. No. 34) at 14; Boone Affm. (Dkt. No. 16-3) ¶¶ 4-5)

that the safe belonged to someone else, and that he did not know what it contained.  (GX 57, at 0:03-0:10; Hrg. Tr. (Dkt. No. 34) at 88)  And three days later, Boone presented an entirely different account to a New York State grand jury:  Boone testified that he owned the safe, that it had contained $5,000 in cash, and that the cash had been stolen by the NYPD.  (Hrg. Tr. (Dkt. No. 34) at 165)[10]

Finally, as someone with convictions for second degree murder and criminal possession of a weapon, Boone is aware that there is a "good chance" that he will "spend a lot of time in prison if [he is] convicted" – "[m]aybe even the rest of [his] life."  (Id. at 144-48)  This knowledge gives Boone a compelling motive to testify in a fashion that supports his motion to suppress.

The Court concludes that Fortune freely and voluntarily consented to a search of the Apartment.

## II.   WHETHER BOONE OBJECTED TO THE SEARCH OF THE APARTMENT

### A.   Applicable Law

The Supreme Court has held that where "a potential defendant with self-interest in objecting is in fact at the door and objects [to a search], the co-tenant's permission does not suffice for a reasonable search."  Georgia v. Randolph, 547 U.S. 103, 121 (2006).  Accordingly, "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident."  Id. at 120; see also Baines v. City of New York, No. 10-CV-9545 (JMF), 2015 WL 3555758, at *5 (S.D.N.Y. June 8, 2015) ("[I]f two people with

---

[10]  Given Boone's lack of credibility, the Court likewise rejects his claim that he "heard" officers open the safe "at least three times" before they obtained a search warrant.  (Id. at 142, 144)

common authority over a property are present and one consents to a search, but the other immediately objects, the search is unreasonable as to the objecting party.").

**B.**   **Analysis**

At the suppression hearing, Boone testified that at some point before Fortune signed the consent to search form, he told "Detective Bray" that he did not consent to a search of the Apartment.  (Hrg Tr. (Dkt. No. 34) at 131)  Boone testified that he again objected to a search of the Apartment immediately after Fortune returned to the living room with a copy of the consent to search form.  (Id. at 135)  Boone argues that because he was "'a physically present resident'" who "'express[ly] refus[ed]'" to consent to a search, the officers' search of his bedroom was unlawful.  (Def. Post-Hrg. Br. (Dkt. No. 36) at 2 (quoting Randolph, 547 U.S. at 120))

As an initial matter, Boone's testimony at the hearing differs in important respects from his affirmation.

While Boone recounts in detail in his affirmation how (1) the police "asked Mr. Fortune to go with them to the kitchen"; (2) "Mr. Fortune returned to the living room with a sheet of paper"; (3) he asked Fortune what the paper was; (4) Fortune said it was "his copy of the search warrant"; (5) Boone "took the paper and saw that it was not a search warrant but [was instead] an unsigned consent to search form"; and (6) "[t]he police began searc[h]ing the apartment" (Boone Affm. (Dkt. No. 16-3) ¶¶ 10-11), he says nothing in his affirmation about objecting to or complaining about the search at this point.  At the hearing, however, Boone testified that – after seeing the consent to search form – he "kind of lost it . . . I want to say that I yelled.  I don't know if I yelled or anything, but when I saw it said consent form, I said, you cannot do this.  This is against the law.  This is not a search warrant. . . . I just screamed, 'get out

of my house.'" (Hrg. Tr. (Dkt. No. 34) at 135-36)  Based on the credible evidence at the hearing, the Court concludes that the loud and vociferous protest Boone describes never happened.

As discussed above, the search of the Apartment began at about 1:50 a.m., and the safe was discovered in Boone's bedroom at about 1:56 a.m.  (Id. at 23; DX F, at 7:10-13:18)  The body camera footage introduced at the hearing includes the entire time period between 1:50 a.m. and 1:56 a.m., and the footage contains no evidence that Boone objected to the search prior to the discovery of the safe.  Officers Wanzer and Mora – who were present in the Apartment throughout – testified that Boone made no objection to the search until the safe was discovered. (Hrg. Tr. (Dkt. No. 34) at 23, 69-70, 115)  Acknowledging that the body camera footage between 1:50 a.m. and 1:56 a.m. comes from an officer searching the kitchen – which is next to the living room – the loud protest and "scream[ing]" Boone describes (see id. at 135-36) would presumably have been audible on the body camera footage, but that footage reflects no complaints by Boone. (DX F, at 7:10-13:18)  The Court concludes that the incident Boone describes never happened.

As to Boone's contact with "Detective Bray," Boone's affirmation contains no mention of this officer.  Boone does state, however, that an unnamed detective "asked me if they could search the apartment and I said no."  (Boone Affm. (Dkt. No. 16-3) ¶ 10)  At the suppression hearing, Boone testified that – in the presence of Officers Wanzer and Mora, and Fortune – Detective Bray asked Boone to consent to a search of the Apartment.  (Hrg. Tr. (Dkt. No. 34) at 130-31)  According to Boone, he refused to consent, and Detective Bray said "'we can get a warrant.'"  Boone replied, "'well, you do that.  Get a warrant then.'"  (Id. at 131)  Boone further testified that the officers "made it seem like they went out of the house to get a warrant." (Id. at 132-33)  "[A]bout 15, maybe 20 minutes later, after they left, they come back, and I hear,

'we got the warrant.  We got the warrant.'"  At this point, the officers brought Fortune to the kitchen, where he later signed the consent to search form.  (Id. at 133-34)[11]

As discussed above, Officers Wanzer and Mora – who were allegedly present for Boone's conversation with Detective Bray (id. at 130-31) – testified that Boone made no objection to a search of the Apartment until the safe was discovered in his bedroom.  (Id. at 23, 115)  Given Boone's inconsistent and contradictory accounts of what transpired that evening, and the body camera footage, this Court finds the officers' testimony more credible than Boone's testimony.  The Court concludes that Boone did not object to the search until the safe was discovered in his bedroom, and he realized that the presence of the handgun in the safe put him in jeopardy.  Accordingly, there is no basis for suppression under Randolph.

### III.  FORTUNE'S AUTHORITY TO CONSENT TO A SEARCH OF BOONE'S BEDROOM

#### A.  Applicable Law

Police officers may reasonably search a residence based on the consent of a third person "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."  United States v. Matlock, 415 U.S. 164, 171 (1974).  A third party has actual "authority to consent to a search of a home when that person (1) has access to the area searched and (2) has either (a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to the area."  Moore v. Andreno, 505 F.3d 203, 208-09 (2d Cir. 2007).

---

[11]  Fortune – who was allegedly present for Boone's exchange with Detective Bray (Hrg. Tr. (Dkt. No. 34) at 130-31) – makes no mention in his affirmation (Dkt. No. 16-4) of Boone's alleged conversation with Detective Bray.

Actual authority under <u>Moore</u> thus "requires that the consenting party have access to the premises searched." <u>United States v. Gilmore</u>, 498 F. Supp. 3d 585, 588 (S.D.N.Y. 2020); <u>see also id.</u> at 588-89 (finding that a consenting co-tenant had access to the defendant's bedroom under <u>Moore</u> where "[t]he bedroom was unlocked at the time of the search" and where the defendant and his co-tenant "used the same means of access[ing]" the bedroom when it was locked).

As to the determination of whether a third party has "common authority" over an area, the Supreme Court has cautioned that

> [c]ommon authority is . . . not to be implied from the mere property interest a third party has in the property.  The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

<u>Matlock</u>, 415 U.S. at 171 n.7 (citations omitted).

"[E]ven if a third party lacks actual authority to consent to a search of a particular area, he still may have apparent authority to consent to the search." <u>Moore</u>, 505 F.3d at 209.  A third party has "apparent authority" to consent to a search where he or she "reasonably appear[s] to the police to possess authority to consent to the search." <u>United States v. McGee</u>, 564 F.3d 136, 139 (2d Cir. 2009).

A person's "apparent authority" to consent to a search "must be judged against an objective standard:  would the facts available to the officer[s] at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 188 (1990) (alteration in original) (citation and quotation marks omitted).

One co-tenant may "consent to a search of [another co-tenant's] bedroom" when it "appear[s] that she has authority to do so." United States v. Rojas, 906 F. Supp. 120, 129 (E.D.N.Y. 1995); see also Gilmore, 498 F. Supp. 3d at 589 (finding that a co-tenant "had apparent authority to consent to the search" of the defendant's bedroom when the co-tenant told law enforcement that he "was the leaseholder of the apartment and that [the defendant] did not use the apartment as a primary residence"). In United States v. Orejuela-Guevara, 659 F. Supp. 882 (E.D.N.Y. 1987), the court upheld a search of the defendant's bedroom on the basis of a co-tenant's consent under the following circumstances:

> The government has met its burden of proving that the agents had a reasonable basis to conclude that [the co-tenant] Gallo had authority to permit that search. [Defendant] Maria Orejuela was in the apartment during the interview of Gallo, within earshot of the conversation. More importantly, when Agent Santiago broached the subject of the search of the apartment, according to the government's proof, Orejuela walked into the living room and sat down on the couch next to Gallo as he was presented the consent form. Although she said nothing, she appeared to be reading the form along with Gallo. She sat quietly as he signed the consent form. She then answered the agents' questions about who slept in each bedroom without any reluctance, protest or visible apprehension. And, as the search progressed to her own bedroom, she said nothing and she did nothing. Under these circumstances, it was reasonable for the officers and agents to conclude that Gallo not only had access to Orejuela's bedroom but had as well at least implied authority to permit the search.

Id. at 886.

### B.      Analysis

Boone argues that "even if the Court decides that [he] did not refuse consent or object to the search, it was not objectively reasonable for the police to believe that Mr. Fortune had the authority to consent to the search of Mr. Boone's bedroom." (Def. Post-Hrg. Br. (Dkt. No. 36) at 6) According to Boone, the "facts available to Officer Wanzer and Officer Mora[] would not 'warrant a man of reasonable caution in the belief that [Fortune] had authority over [Boone's bedroom].'" (Id. at 7 (quoting Rodriguez, 497 U.S. at 188))

As to actual authority, the evidence demonstrates that Fortune was the sole leaseholder of the Apartment.  (Hrg. Tr. (Dkt. No. 34) at 19-20; Boone Affm. (Dkt. No. 16-3) at ¶ 2)  But as the Supreme Court states in Matlock, "[c]ommon authority is . . . not to be implied from the mere property interest a third party has in the property," but "rests rather on mutual use of the property by persons generally having joint access or control for most purposes."  Matlock, 415 U.S. at 171 n.7.  In his affirmation and at the suppression hearing, Boone maintained that his bedroom is his "private space"; that Fortune "does not have [his] permission to enter [his] bedroom"; and that Fortune "does not keep any personal belongings in [his] bedroom and has no reason to access it."  (Boone Affm. (Dkt. No. 16-3) ¶ 3; Hrg. Tr. (Dkt. No. 34) at 126-27) Fortune's affirmation likewise states that Boone's bedroom is Boone's "private space" and that he "does not have [Boone's] permission to go into his bedroom."  (Fortune Affm. (Dkt. No. 16-4) ¶ 5)

Given this record, the Court cannot find that Fortune had actual authority to consent to a search of Boone's bedroom.  The record does not establish that Fortune had "permission" to enter Boone's bedroom, or that he had either "common authority" over or had a "substantial interest" in Boone's bedroom.  Moore, 505 F.3d at 209.

As to apparent authority, Fortune and Boone told the officers when they first arrived at the Apartment that Fortune and Boone lived alone in the Apartment, that Fortune was the sole leaseholder, that Boone's name was not on the lease, and that each man was sleeping in a separate bedroom when the shooting began.  (Hrg. Tr. (Dkt. No. 34) at 14, 19-20, 37-38, 43-44, 65-66, 94-95, 133; GX 5, at 0:01-0:20; DX C, at 0:03-0:18)  When the two men retrieved their identification, the officers observed that they entered separate bedrooms, that the door to Boone's bedroom was open and unlocked, and that Boone's bedroom contained clothing and

personal effects.  (Hrg. Tr. (Dkt. No. 34) at 16, 40-41, GX 4, at 0:15-0:40)  While Boone closed the door to his bedroom after retrieving his identification (GX 4, at 0:58-1:02) – which showed the 1428 Webster Avenue address (DX A) – there is no evidence that he locked the door, that anyone told the officers that Boone routinely kept the door to his bedroom locked when he was absent from the apartment, or that the door to Boone's bedroom contained any device that would permit Boone to lock the door from the outside.  There is likewise no evidence that anyone told the officers that Fortune had no access to Boone's bedroom.

Officer Wanzer testified that while Fortune and Boone were retrieving their identification from their bedrooms, another officer asked Fortune if he would consent to a search of the Apartment's third, unoccupied bedroom.  (Hrg. Tr. (Dkt. No. 34) at 16, 38-39)  The body camera footage shows that Boone was standing only a few feet away from Fortune when Fortune authorized a search of the third bedroom, and that Boone did not raise any objection.  (GX 4, at 0:53-1:05)

Officer Wanzer and Officer Mora both testified that they asked Fortune – as opposed to Boone – for consent to search the Apartment because of their understanding that Fortune was the leaseholder and that Boone's name was not on the lease.  (Hrg. Tr. (Dkt. No. 34) at 59, 65-66, 79)  As discussed above, when the officers brought Fortune into the kitchen to sign the consent to search form, Officer Wanzer read Fortune the full text of the form.  (GX 53, at 0:10-1:19)  The form that Fortune signed states, inter alia, that, "I am a legal owner or lawful custodian of the location, vehicle, or items being searched, or otherwise have legal authority over them."  (Id.; GX 100)

Finally, while Boone claims that he objected to the search of the Apartment both before and immediately after Fortune signed the consent to search form (Hrg. Tr. (Dkt. No. 34)

at 131, 135), this Court has rejected his testimony as not credible, given the implausibilities, inconsistencies, and contradictions in his varied accounts.  The Court thus accepts the officers' testimony that Boone remained silent even after he became aware that Fortune had signed a consent to search form, and even after the search of the Apartment began.  As discussed above, it was only after the safe was discovered in Boone's bedroom that he raised objections to the search.

Given that the officers were aware that (1) Fortune was the leaseholder of the Apartment; (2) Boone's name was not on the lease; (3) Boone's bedroom door was open and unlocked when he retrieved his identification; (4) Boone did not lock his bedroom door after retrieving his identification (and there is no evidence that there was a mechanism to lock the door from the outside); (5) Boone did not object when Fortune consented to a search of the third, unoccupied bedroom; (6) Fortune signed a consent to search form stating that he was the "legal owner or lawful custodian of the location . . . being searched"; and (7) there is no credible evidence that Boone objected to Fortune providing consent to search or to the search itself prior to the discovery of the safe in Boone's bedroom, the Court concludes that Fortune "reasonably appear[ed] to the police to possess authority to consent to the search" of the entire Apartment, including Boone's bedroom.  McGee, 564 F.3d at 139.

## CONCLUSION

For the reasons stated above, Boone's motion to suppress is denied.  The Clerk of

Court is directed to terminate the motion (Dkt. No. 16).

Dated: New York, New York
February 1, 2024

SO ORDERED.

Paul G. Gardephe
United States District Judge